UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7 |
| MLCJR, LLC, et al., | § | CASE NO. 23-90324 |
| | § | |
| DEBTORS | § | JUDGE CHRISTOPHER LOPEZ |
| | § | |
| | § | Jointly Administered |
| | § | |
| R. & R. BOATS, INC.; OFFSHORE | § | |
| LIFTBOATS, LLC; & SEACOR | § | |
| MARINE LLC, | § | |
| | § | |
| PLAINTIFFS, | § | ADV. PROC. NO. |
| | § | |
| V. | § | |
| | § | |
| GOL, L.L.C., | § | |
| | § | |
| DEFENDANT | § | |

**PLAINTIFFS' COMPLAINT FOR A DECLARATORY
JUDGMENT DETERMINING INTERESTS IN
PROPERTY AND ALLOCATING CRITICAL VENDOR FUNDS**

Plaintiffs R. & R. Boats, Inc. ("R&R Boats"); Offshore Liftboats, LLC ("OLB"); and

SEACOR Marine, LLC ("SEACOR" and together with R&R Boats and OLB, the "Plaintiffs") by

and through undersigned counsel, hereby file this original complaint (the "Complaint") against

Defendant GOL, L.L.C. ("GOL"). In support of this Complaint, Plaintiffs respectfully show this

Court as follows:

## I.     INTRODUCTION

1.     Plaintiffs seek from this Court a declaratory judgment determining their interests

in, and allocating, critical vendor funds paid to GOL with the exclusive authorized purpose of

paying prepetition claims of vessel operators—including the Plaintiffs—who serviced oil and gas

properties belonging to the estates of the above-captioned debtors ("Debtors"). Pre- and

1

postpetition, GOL acted as an intermediary between Debtors and certain vessel owners and operators ("Operators"), including Plaintiffs, facilitating the Debtors' charters of the Operators' vessels. As broker-agent on behalf of Operators, GOL agreed pursuant to brokerage agreements to invoice Debtor Cox Operating, L.L.C. ("Cox") for chartered services and to collect charter hire on the Operators' behalf. In exchange, GOL was entitled to collect a fee from the charter hire paid to the Operators. As reflected in the brokerage agreements, GOL had no pecuniary interest in the charter hire it collected from Debtors on behalf of the Plaintiffs, other than its right to collect its fee as broker from the charter hire.

2.      Unbeknownst to Plaintiffs, while GOL was ostensibly acting as broker-agent for Plaintiffs and working to collect on Plaintiffs' pre-petition claims in the chapter 11 cases, GOL used the Operators' prepetition claims against the Debtors' estates to obtain $13,000,000 in critical vendor funds, which monies were reserved for the payment of qualified prepetition claims in accordance with the provisions of this Court's Critical Vendor Order (defined below).

3.      GOL never had a prepetition claim against the Debtors (or, at least, it never held a claim on its own behalf), as it never provided services to the Debtors. GOL had at most, a right and obligation to collect invoiced amounts from the Debtors on behalf of the Operators, and to remit a portion of the Operators' fees collected to itself as payment for brokerage services. Nevertheless, the Debtors estimated GOL to have a prepetition claim in the amount of $24,800,000 on or around the time of the petition date, which sum consisted of the aggregated claims of the Operators. Payment of the $13,000,000 to GOL provided no benefit to the bankruptcy estates, unless and until the money was allocated and paid to the Operators, which always held their claims directly against the estates according to their brokerage and charter agreements.

4. Without compliance with the Critical Vendor Order's reporting requirements, GOL disbursed critical vendor funds to itself and its own affiliates, including at least one affiliate who had no prepetition claim against Cox whatsoever. GOL also used these estate funds to extract personal benefits, including releases from certain Operators, at the expense of the bankruptcy estates. Plaintiffs' prepetition claims were left unpaid. In other words, estate money that was authorized for the exclusive purpose of paying qualified prepetition creditor claims, was used to pay at least one non-creditor, to the detriment of the Plaintiffs as well as the bankruptcy estates, which did not benefit from a corresponding reduction in legitimate claims.

5. Plaintiffs individually sued GOL in the U.S. District Court for the Eastern District of Louisiana for, among other things, breach of its obligations under the brokerage agreements. The cases (the "E.D. La. Actions") are currently pending under the captions, *R&R Boats, Inc., v. Gulf Offshore Logistics, LLC*, No. 24-cv-1875 (E.D. La.) (Fallon, J.); *Offshore Liftboats, LLC v. Gulf Offshore Logistics, LLC*, No. 24-cv-1632 (E.D. La.) (Guidry, J.); and *SEACOR Marine, LLC v. GOL, LLC*, No. 24-2409 (E.D. La.) (Vance, J.). After extensive and hard-fought discovery in the E.D. La. Actions, Plaintiffs discovered that GOL had received the $13,000,000 on account of Operators' claims and unilaterally allocated this sum without direction from the Debtor, and without post-disbursement disclosure to parties explicitly entitled to disclosure under the terms of the Critical Vendor Order, including the U.S. Trustee. Plaintiffs have also learned that GOL made disbursements of critical vendor funds to persons not authorized to receive payment of these funds under the Critical Vendor Order.

6. Plaintiff SEACOR raised these improprieties at the summary judgment stage in its respective E.D. La. Action. The Hon. Sarah S. Vance recently granted summary judgment in favor

of GOL, dismissing Civil Action No. 24-2409.[1] In her Order and Reasons, Judge Vance found that no portion of the $13,000,000 was allocated to SEACOR and the Trade Agreement between GOL and the Debtors impliedly permitted only payment on prepetition invoices of Operators who had continuously provided services through the petition date. Judge Vance declined to reallocate the monies, suggesting that reallocation or other remedy should be sought by the chapter 7 trustee.

7.      In light of Judge Vance's judgment, Plaintiffs bring this suit to have this Court interpret and enforce its prior Critical Vendor Order and allocate the $13,000,000 sum paid to GOL on account of the Operators' prepetition claims amongst the Operators, who are the actual claimants against the estates.[2]

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334(b) and § 2201(a).

9.      This adversary proceeding is a core proceeding to be heard and determined by the Bankruptcy Court under 28 U.S.C. § 157(b)(2)(A), (B), & (K).

10.     To the extent that any matter herein is non-core, the Plaintiffs hereby consent to the Court's entry of a final judgment resolving this Adversary Proceeding.

11.     Venue for this adversary proceeding is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] Order and Reasons, Doc. 65, *SEACOR Marine, LLC v. GOL, LLC*, No. 24-2409 (Sept. 16, 2025, E.D. La.) (Vance, J.). SEACOR is seeking reconsideration of the Order and Reasons and judgment contemporaneously with the filing of this complaint.

[2] Plaintiffs reserve their rights to amend to assert additional causes of action or remedies, including claw back of monies paid to GOL under the Critical Vendor Order to the estates, of which Plaintiffs are creditors.

12.     This adversary proceeding is commenced pursuant to 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and sections 105, 362(k), 502, and 506 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").

### III.     NATURE OF ACTION

13.     This is an action pursuant to Bankruptcy Rule 7001 and the Declaratory Judgment Act, 28 U.S.C. § 2201.

### IV.     PARTIES

14.     Plaintiff R. & R. Boats, Inc. is a Louisiana corporation with its principal place of business in Houma, LA. R&R Boats, after being hired by GOL, provided pre-petition work to Cox, and is a creditor in the above-captioned matter.

15.     Plaintiff Offshore Liftboats, LLC is a Louisiana limited liability company with its principal place of business in Cut Off, Louisiana. OLB, after being hired by GOL, provided pre-petition work to Cox, and is a creditor in the above-captioned matter.

16.     Plaintiff SEACOR Marine, LLC is a limited liability company organized pursuant to the laws of Delaware. SEACOR, after being hired by GOL, provided pre-petition work to Cox, and is a creditor in the above-captioned matter.

17.     Defendant GOL, L.L.C., is a Louisiana limited liability company with its principal place of business in Raceland, LA. GOL can be served through its registered agent Matt Bernard, 4535 Highway 308, Raceland, LA, 70394.

### V.     FACTUAL BACKGROUND

#### A.  GOL and its Affiliates

18.     GOL is a boat broker. Prior to the Debtors filing for voluntary bankruptcy protection on May 14, 2023 ("Petition Date"), it operated as a middle-man between Operators (including Plaintiffs) and Cox, a Debtor and the face of the Debtors' operations with respect to vendors. GOL

5

facilitated charters of the Operators' vessels, but it did not provide these vessels itself (it does not own any vessels) and it had no right to charter hire other than collecting on invoices issued and remitting the charter hire to operators less its fee as broker (customarily in the range of 2%).

19.     In addition to true third party Operators, such as the Plaintiffs, GOL has a number of affiliated vessel owning entities for whom it acts as broker.

20.     GOL is owned by three individuals. Rec Chaddock owns 50%; Joel Broussard owns 40%; and Todd Danos owns 10%. The three owners individually also own (in varying proportions) several affiliated companies. As relevant to this case, Mr. Chaddock owns 100% of REC Marine Logistics, LLC ("REC Marine"). REC Marine and GOL share office space and GOL employees often provide operational support to REC Marine.

21.     Additionally, at the times relevant to this dispute, Mr. Chaddock was president of GOL. Mr. Chaddock and Mr. Broussard are each 50% owners in another company, RO Boats, LLC ("RO Boats"). RO Boats also shares office space with GOL, and they both have the same General Counsel. Mr. Danos separately owns 100% of Lafourche Tugs, Inc. ("Lafourche Tugs"). While GOL brokered vessels owned by both REC Marine and Lafourche Tugs, GOL did not broker any RO Boats' vessels to Cox.

**B.  Brokerage Agreements between the respective Plaintiffs and GOL**

22.     Plaintiffs own and operate vessels that provide a variety of services to the offshore oil and gas industry.

23.     Between 2016 and 2018, GOL entered brokerage agreements with each of the Plaintiffs.  The material terms of each of these agreements are substantially similar.

24.     In 2016, GOL entered a Brokerage Agreement ("GOL-R&R Brokerage Agreement") with R&R Boats, in which GOL agreed to serve as R&R Boat's broker-agent: "Operator [R&R Boats] hereby appoints Broker [GOL] as Operator's agent for obtaining charters

6

for Operator's vessels."  And, should GOL be paid for R&R Boats' work,  "[GOL] will remit net charter hire (charter hire less Broker's fee) to [R&R Boats] within fifteen (15) business days after receipt of such charter hire from the Charterer."[3]

25.     The 2016 Brokerage Agreement between GOL and OLB ("GOL-OLB Brokerage Agreement") contains the same broker-agent and payment terms: "Operator [OLB] hereby appoints Broker [GOL] as Operator's agent for obtaining charters for Operator's vessels[,]" and, "[GOL] will remit net charter hire (charter hire less Broker's fee) to [OLB] within fifteen (15) business days after receipt of such charter hire from the Charterer."[4]

26.     The May 17, 2018 agreement between GOL and SEACOR ("GOL-SEACOR Brokerage Agreement") contains nearly the same broker-agent and payment terms: "Operator [SEACOR] hereby appoints Broker [GOL] as Operator's agent solely for the purpose of obtaining charters for Operator's vessels[,]"  and "[GOL] will remit net charter hire (charter hire less Broker's fee) to [SEACOR] within fifteen (15) business days after receipt of such charter hire from the Charterer."[5]

27.     Each of these brokerage agreements permitted GOL to obtain charters for Plaintiffs' vessels, subject to the respective Plaintiff's consent. Once a vessel was chartered pursuant to the agreement, charter hire was paid by the charterer directly to GOL, who then disbursed the proceeds to Plaintiffs, after deduction of GOL's brokerage fee, which was usually approximately 2% of a given invoice.

---

[3] Exhibit 1, GOL-R&R Brokerage Agreement.
[4] Exhibit 2, GOL-OLB Brokerage Agreement.
[5] Exhibit 3, GOL-SEACOR Brokerage Agreement.

28.     Each Brokerage Agreement provides that GOL is not directly liable for any charterer's nonpayment of charter hire, but explicitly obligates GOL to "undertake all reasonable efforts to collect charter hire from the Charterer."[6]

29.     Additionally, each operator "retain[ed] the right to act on its own behalf in order to collect unpaid invoices directly from the Charterer."[7] But even if an operator independently attempts to collect directly from the Charterer, under the Brokerage Agreement, GOL still has the obligation to take all reasonable efforts to collect.

### C.  Pre-Bankruptcy Events

#### i.     R&R Boats charters vessels through GOL

30.     Beginning in August 2022, R&R Boats chartered a number of vessels through GOL for the benefit of Debtors and issued invoices to GOL reflecting the agreed-upon hire rates and charter terms, along with the principal amounts due under the invoices. The invoices ("R&R Invoices") are summarized in the table below:

| Vessel | Charter Term | Relevant Invoices | Outstanding Hire |
|---|---|---|---|
| M/V Lyla Angelle | 8/1/22-4/30/23 | 2272, 2269, 2262, 2248, 2242, 2236, 2223, 2213, 2207, 2205 | $941,586.00 |
| M/V Dylan John | 7/1/22-1/11/23 | 2245, 2231, 2230, 2221, 2214, 2210, 2202, 2197 | $714,116.74 |
| M/V Landon James | 8/1/22-9/17/22 | 2209, 2206 | $159,530.00 |
| M/V Zachary Taylor | 7/1/22-1/8/23 | 2243, 2238, 2225, 2208, 2204, & 2200 | $393,510.83 |
| M/V Jessica Faye | 8/1/22-3/22/23 | 2258,2251,2241,2234,2224, 2215 | $616,080.83 |
| **PRINCIPAL** | | | **$2,815,561.40** |

---

[6] Exhibit 1, GOL-R&R Brokerage Agreement; Exhibit 2, GOL-OLB Brokerage Agreement; Exhibit 3, GOL-SEACOR Brokerage Agreement.
[7] Exhibit 3, GOL-SEACOR Brokerage Agreement.

31.     The R&R Invoices obligate GOL to pay a finance charge of 18% per annum if not paid in full within sixty (60) days.[8]

32.     GOL chartered the M/V Lyla Angelle, M/V Dylan John, M/V Landon James, M/V Zachary Taylor, and M/V Jessica Faye (each an "R&R Vessel" and all together, the "R&R Vessels") to Cox for use in connection with Cox's oil and gas operations in navigable waters.

33.     When the R&R Vessels were under charter, GOL was aware that Cox was not paying their vendors and that bankruptcy was likely imminent.

34.     Despite amicable demand made by R&R Boats for the amounts due and owing under the R&R Invoices, R&R Boats has not been paid for its services.

### ii.     SEACOR charters vessels through GOL

35.     In the fall of 2022, GOL presented SEACOR with an offer to charter two of SEACOR's vessels to Cox. SEACOR agreed, and two of its vessels—the SEACOR HAWK and the SEACOR FEARLESS—provided services to Cox from September to December 2022. Pursuant to their course of dealing, SEACOR invoiced GOL for those services, and GOL, in turn, invoiced Cox. Those invoices, which totaled $2,697,899.50, went unpaid.

36.     Prior to filing separate litigation, on January 11, 2024, SEACOR issued a formal request to GOL for a "full and sworn" accounting pursuant to La. Civil Code Art. 3003. SEACOR sought to determine how much Cox had paid to GOL and how GOL had disbursed those funds.

37.     On January 25, 2024, GOL, through its counsel, refused to provide the requested accounting, claiming that its post-bankruptcy dealings with Cox were confidential and could not be disclosed.

---

[8] Exhibit 1, GOL-R&R Brokerage Agreement.

9

### iii.   OLB charters vessels through GOL

38.   In fall 2022, GOL chartered vessels from OLB in support of Cox's oil wells.

39.   GOL was aware that Cox was not paying its vendors and that a bankruptcy was imminent by mid-2022.

40.   Despite this, GOL chartered boats from OLB, who in turn provided services for Cox. OLB presented GOL with the invoices for this work. These invoices, which totaled $3,339,343.78, went unpaid.

### D.   Cox's Bankruptcy Filing and the Debtor-GOL Trade Agreement

41.   On the Petition Date, the Debtors commenced their voluntary chapter 11 cases.

42.   On May 15, 2023, the Debtors filed the *Debtors' Emergency Motion for Entry of an Order (A) Authorizing the Payment of Certain Essential Vendor Obligations, (II) Marketing Expenses, and (III) Outstanding Orders, and (B) Granting Related Relief* [No. 23-90324, D.I. 15] (the "Critical Vendor Motion"). In the Critical Vendor Motion, the Debtors requested authority from this Court to use estate monies to pay up to $40 million in "Essential Vendor Obligations" on customary trade terms.

43.   The Debtors described five categories of "Essential Vendor Activities," including, "Transportation and Dock Services." As justification for payment of these Essential Vendor Obligations, the Debtors noted these "Transportation Vendors" might be able to "assert materialman and workman liens on or against the Debtors' assets, including, but not limited to, the Debtors' interests in the Oil and Gas Leases." The Debtors included Essential Vendor Obligations as the primary category of "Oil and Gas Obligations."

44.   The Debtors represented to the Court that payment of Oil and Gas Obligations "should not impair unsecured creditor recoveries in the Chapter 11 Cases." This was because—the Debtors explained—the payees were to be creditors themselves, likely secured creditors, given

10

their ability "to perfect liens on, among other things, the Debtors' wells, the production and proceeds therefrom, the Debtors' working interests (which are real property rights), and fixtures and equipment associated on the oil and gas properties," pursuant to the Louisiana Oil Well Lien Act, La. R.S. §§ 9:4861–9:4873.

45.     On May 16, 2023, the Court entered the *Order (A) Authorizing the Payment of Certain (I) Essential Vendor Obligations, (II) Marketing Expenses, and (III) Outstanding Orders, and (B) Granting Related Relief* [No. 23-90324, D.I. 112] (the "Critical Vendor Order").

46.     In the Critical Vendor Order, this Court ordered, "The Debtors are authorized, but not directed, to pay accrued and outstanding prepetition Oil and Gas Obligations in the ordinary course of business in the amounts, categories, and manners described in the Motion." Given the definition of Oil and Gas Obligations, the Debtors were not authorized by the Court to pay monies to any person not holding an accrued and outstanding prepetition claim premised on the provision of an enumerated prepetition service to the Debtors.

47.     The Critical Vendor Order contained guardrails to prevent estate funds from being disbursed to insiders and affiliates of insiders to the Debtors. The Debtors were required to give advance notice to statutory committees and the U.S. Trustee of disbursements to insiders. And in the event of an objection, the disbursement benefitting the insider would be prohibited pending further order by the Court.

48.     The Critical Vendor Order also states that the Debtors could require that a payee maintain or apply the same or better trade terms during the pendency of the Chapter 11 case that were the same or better than those immediately prior to the petition date.

49.     The Critical Vendor Order also required:

The Debtors shall maintain a matrix/schedule of payments made pursuant to this Order, including the following information: (a) the name of each payee; (b) the

nature of the payment; (c) the amount of the payment; (d) the category or type of payment; (e) the Debtor or Debtors that made the payment; (f) the payment date; and (g) the purpose of such payment. The Debtors shall provide a copy of such matrix/schedule on a confidential and professional eyes' only basis to the U.S. Trustee, any statutory committee appointed in the Chapter 11 Cases, and the advisors to the DIP Lenders every 30 days beginning upon entry of this Order, beginning with the period from the Petition Date through May 31, 2023, which shall be due on June 30, 2023.

50.     On May 26, 2023, pursuant to the Critical Vendor Order, the Debtor and GOL entered into a Trade Agreement (the "Debtor-GOL Trade Agreement").[9] Therein, the Debtor estimated GOL's "Prepetition Claim" to be $24,800,000, and the Debtor agreed to pay "$13,000,000 towards GOL's Prepetition Claim" in four weekly installments from May 26, 2023 through June 16, 2023 (the "Critical Vendor Fund").

51.     At the time the Debtor-GOL Trade Agreement was executed, GOL had not filed any proof of claim.

52.     The Debtor filed its Schedule E/F on June 21, 2023 [No. 23-90324, D.I. 478]. Therein, the Debtor Scheduled GOL as having a contingent and unliquidated secured claim of "Undetermined amount" and a fixed, liquidated, and undisputed general unsecured claim in the amount of $28,552,952.36.

53.     On July 24, 2023, GOL filed a proof of claim into the Debtor's claim register asserting a secured claim in the amount of $15,913,700.77 against Cox Operating L.L.C., [No. 23-90324, POC No. 27-1], overriding the Debtor's scheduled claim for GOL. GOL's asserted proof of claim was $12,639,251.59 less than the total amount the Debtors had scheduled as being undisputedly due to GOL. The difference approximates the $13,000,000 amount in estate funds the Debtors paid to GOL on account of its Prepetition Claim pursuant to the Debtor-GOL Trade

---

[9] Exhibit 4, Debtor-GOL Trade Agreement.

12

Agreement, indicating that GOL waited until it had disbursed the Critical Vendor Fund to itself and its affiliates before filing a proof of claim—GOL then subtracted this amount from the claim total.

54. GOL attached notices of liens to its proof of claim, and in support of each lien, GOL submitted copies of the invoices it had issued to Cox for the use of R&R Boats' vessels, SEACOR's vessels, and OLB's vessels.

55. Payment of the $13,000,000 to GOL, ostensibly a payment of the Debtors' prepetition Oil and Gas Obligations, had no effect on the Debtors' total liabilities unless and until it was disbursed to Operators. That is because GOL $24,800,000 claim was wholly premised on services of the Operators, and the Operators were in direct privity with a Debtor, and had a direct right of payment from the bankruptcy estates.

**E. GOL disburses the Critical Vendor Fund to itself, and its affiliates, at the expense of Operators and the bankruptcy estates**

56. Upon receiving the Critical Vendor Fund, GOL did not disburse the money to the Operators in good faith and in accordance with any discernable methodology.

57. GOL, did not, for example, allocate the $13,000,000 Critical Vendor Fund amongst the Operators on a *pro rata* basis. Nor did GOL pay its operators on a priority basis, giving preference to the strongest priority or secured claims of operators against the Debtor's estate.

58. Nor did GOL request that Plaintiffs perform post-petition services on customary (or better) trade terms for the Debtors in exchange for payment of Plaintiffs' prepetition claims.

59. Instead, GOL disbursed the Critical Vendor Fund by primarily paying or "loaning" monies directly to itself or companies affiliated with GOL by common ownership.

60. GOL paid Plaintiffs nothing, so the Plaintiffs' claims against the Debtor's estate were not reduced.

13

61.     According to GOL's own records and discovery responses in the E.D. La. Actions, of the $13,000,000 GOL received to pay Operators' prepetition claims, GOL paid most (at least $9,000,000) of this sum to GOL's affiliates with overlapping ownership.

62.     GOL's affiliates' pre-petition claims against Cox totaled approximately $6,500,000. Accordingly, the Critical Vendor Fund was not merely used by GOL to compensate GOL and its affiliates in full for prepetition services, more than $2,500,000 of the Critical Vendor Fund retained by GOL and its affiliates was not attributable to any pre-petition services provided by GOL or its affiliates. In other words, the Critical Vendor Fund was paid to persons who the Court had not authorized to receive payment, while Plaintiffs, who actually held qualifying prepetition Oil and Gas Obligations against the Debtors' estates were not.

63.     For example, REC Marine—fully owned by Mr. Chaddock (who was also President of GOL at the time)—received $7,800,000, which was $1,509,576.89 more than Rec Marine's portion, $6,290,423.11, of the estimated $24,800,000 claim amount, resulting in a recovery rate of 124%.

64.     Lafourche Tugs, a GOL affiliated entity owned by GOL co-owner Mr. Danos, was paid $275,000 against invoices totaling $291,876 (a 94% recovery rate) and also received a "loan" from GOL in the amount of $463,288. This loan was not documented by any promissory note, there were no specific terms of the loan, the loan has not been repaid, and there is no term or concrete plan to repay the loan. It is, in other words and by all outward appearances, a sham.

65.     RO Boats, the GOL affiliate owned by GOL co-owners Mr. Chaddock and Mr. Broussard, received a "loan" of $495,000 from the Critical Vendor Fund through GOL.

66.     RO Boats provided no services whatsoever to Cox prepetition and therefore had no rights whatsoever to share in the Critical Vendor Fund. GOL's corporate representative admitted

that RO Boats did not "supply services to Cox prepetition," and that he was "[n]ot positive" about whether RO Boats supplied "services to Cox post-petition."

67.     Nevertheless, GOL brazenly "loaned" nearly a half million dollars from the Critical Vendor Fund reserved for payment of prepetition Oil and Gas Obligations to RO Boats while remitting nothing to Plaintiffs.



68.     Payment by GOL of a portion of the Critical Vendor Fund to RO Boats violated the Court's Critical Vendor Order as well as the Debtor-GOL Trade Agreement's express instructions that the payments be applied to the estimated $24,800,000 Prepetition Claim.

69.     Payment by GOL of a portion of the Critical Vendor Fund to RO Boats was also a breach of GOL's obligations to make "reasonable efforts" to collect charter hire on behalf of Plaintiffs and to timely remit payment collected to Plaintiffs.

70.     And while the Critical Vendor Order and the Debtor-GOL Trade Agreement required vendors to provide post-petition services on same or better trade terms that existed pre-petition, GOL used the Critical Vendor Fund for personal benefit. Specifically, GOL used the Critical Vendor Fund as leverage obtain a release of liability and indemnity agreement for itself from the only two non-GOL affiliated Operators that received payment from the Critical Vendor Fund, EBI Liftboats, LLC ("EBI") and Barry Graham Oil Service, LLC ("Barry Graham").

71.     GOL conditioned the payment of a portion of the Critical Vendor Fund on each non-affiliated Operator signing a release and indemnity of GOL, a usurpation of an opportunity for the bankruptcy estates.

72.     And while EBI and Barry Graham received prepetition payment, their percentage recovery was far less than what GOL and its affiliates received. Neither of these unrelated Operators received more than 42% of their respective pre-petition invoice amounts. This pales in comparison to the 124% recovery that Rec Marine received for its pre-petition claim.

73.     The chart below contains the currently known information about the disbursement of the Critical Vendor Fund.

| Payments Amounts per Trade Agreement | | | |
|---|---|---|---|
| Payee | Date | Amount | Check# |
| REC Marine Logistics (owned by GOL owner Rec Chaddock) | 5/30/2023 | $2,800,000.00 | |
| REC Marine Logistics (owned by GOL owner Rec Chaddock) | 6/12/2023 | 1,000,000.00 | 18489 |
| REC Marine Logistics (owned by GOL owner Rec Chaddock) | 6/26/2023 | 1,000,000.00 | 18578 |
| REC Marine Logistics (owned by GOL owner Rec Chaddock) | 7/11/2023 | 1,000,000.00 | 18653 |
| REC Marine Logistics (owned by GOL owner Rec Chaddock) | 7/26/2023 | 1,000,000.00 | 18799 |
| Lafourche Tugs (Owned by GOL owner Todd Danos) | 5/30/2023 | 275,000.00 | 18378 |
| Lafourche Tugs (Owned by GOL owner Todd Danos) | 10/25/2023 | 463,288.00 | 19395 |
| EBI | 6/16/2023 | 1,341,247.52 | 18517 |
| BG Oil | 8/1/2023 | 981,995.90 | 18817 |
| RO Boats* | 10/31/2023 | 575,700.00 | 19420 |

16

| | | | |
|---|---|---|---|
| (owned by GOL owners Rec Chaddock and Joel Broussard) | | | |
| | | **$10,437,231.42** | |
| * check amount is $495,000 | | | |

74.     An additional check in the amount of $1,000,000.00 to Rec Marine was also paid by GOL on August 7, 2023.

| | | | |
|---|---|---|---|
| REC Marine Logistics | 8/7/2023 | 1,000,000.00 | 18856 |

75.     Thus, the substantiated amount of GOL payments from the Critical Vendor Fund that were purportedly made pursuant to the Debtor-GOL Trade Agreement total $11,356,531.42. More than $1,600,000 of the Critical Vendor Fund remains unaccounted for.

76.     Below is a chart of the estimated recovery for each of the entities:

| Payment of Critical Vendor Fund | | | | |
|---|---|---|---|---|
| **Entity** | **Ownership interest shared with GOL** | **Estimated Pre-Petition Amount Owed** | **Amount Received** | **Percentage of Recovery** |
| REC Marine Logistics | Yes – Rec Chaddock | $6,290,423.11 | $7,800,000 | 124% |
| Lafourche Tugs | Yes - Todd Danos | $291,876 | $275,000 plus another $463,288 "loan" | 94% and a another $463k "loan" |
| RO Boats | Yes - Rec Chaddock and Joel Broussard | None | $495,000 "Loan" | N/A – no pre-petition work |
| EBI | No | $3,359,778.79 | $1,341,247.52 | 40% |
| BG Oil | No | $2,338,085.47 | $981,995.90 | 42% |

**F.   GOL's principal Chaddock loans $2,000,000 to a Debtor insider's affiliate**

77.     The Critical Vendor Order was specifically written to include guardrails to prevent estate funds from flowing out of the bankruptcy estates into the pockets of Debtor insiders and Debtor insider's affiliates without scrutiny by the U.S. Trustee or official committees' professionals. Nevertheless, there is evidence that this may have occurred.

78.     According to the Debtor's restructuring advisor, Alvarez & Marsal, Brad Cox, a principal of the Debtors, and Mr. Chaddock, enjoyed a "special relationship." The nature of this "special relationship" was such that the Debtors' management determined that Mr. Cox and Mr. Chaddock could not negotiate the terms of the Debtor-GOL Trade Agreement at arms' length.

79.     Indeed, it does not appear that the Debtors and GOL operated at arms' length from one another. GOL maintained an office at the Debtors' headquarters.

80.     On or about February 1, 2024, Mr. Chaddock loaned Mr. Cox's new venture, Natural Resources Worldwide, LLC ("NRW") $2,000,000. This loan was backed by a personal guarantee by Mr. Cox.

81.     Also on February 1, 2024, another venture of Mr. Chaddock's, Array Petroleum, LLC ("Array Petroleum"), entered a lucrative contract with NRW to serve as an operator for NRW's offshore oil and gas properties.

82.     These events occurred just days before this Court's auction of certain of the Debtor's oil and gas properties on February 9, 2024, wherein NRW purchased Debtor assets pursuant to 11 U.S.C. § 363.

83.     Following this purchase, in December 2024, GOL received an overriding royalty interest over NRW's properties. The promissory note memorializing NRW's obligation to Mr. Chaddock was amended and restated in the amount of $1,132,333, again with a personal guarantee by Mr. Cox.

84.    Upon information and belief, NRW later purchased Mr. Chaddock's interests in Array Petroleum.

85.    Given that more than $1,600,000 of the Critical Vendor Fund remains unaccounted for, and the nature of Mr. Cox and Mr. Chaddock's relationship, it is plausible that monies reserved for payment of actual prepetition Oil and Gas Obligations held by Operators, including the Plaintiffs, were used in part or in whole to extend a loan to a Debtor insider to facilitate this insider's purchase of estate assets, all without Court authority.

**G.  The Plaintiffs seek relief in the E.D. La. Actions**

86.    Plaintiffs individually sued GOL in the U.S. District Court for the Eastern District of Louisiana for, among other things, breach of its obligations under the brokerage agreements. Only through highly contentious discovery did Plaintiffs discover that GOL had received the $13,000,000 on account of Operators' claims and unilaterally allocated this sum without direction from the Debtor, and without post-disbursement disclosure to parties explicitly entitled to disclosure under the terms of the Critical Vendor Order, including the U.S. Trustee.

87.    In the E.D. La. Action brought by SEACOR, Civil Action No. 24-2409, GOL moved for summary judgment on SEACOR's claims. A primary thrust of GOL's motion was that—whatever GOL's contractual obligation to remit monies paid to it on account of SEACOR's invoices to COX—the Debtors had not allocated the Critical Vendor Fund to any particular Operator, so GOL was free, and in fact obligated, not to pay any portion of the Critical Vendor Fund to SEACOR.  In opposition, SEACOR argued that it was qualified to receive payment on account of its prepetition Oil and Gas Obligations and GOL's allocation of the Critical Vendor Fund was not authorized by the Critical Vendor Order in addition to being wholly inequitable.

88.    In her Order and Reasons granting summary judgment, Judge Vance found that no portion of the $13,000,000 was allocated to SEACOR by the Debtor, and the Debtor-GOL Trade

Agreement impliedly only permitted payment to Operators who continued providing services through the Petition Date. Judge Vance declined to do her own allocation of the Critical Vendor Fund, in apparent deference to this Court.

89.     Contemporaneously with the filing of this Complaint, SEACOR has asked Judge Vance to reconsider her Order and Reasons. In the alternative, however, SEACOR has asked that Judge Vance hold its reconsideration in abeyance while this Court determines the proper allocation of the Critical Vendor Fund.

90.     The $13,000,000 Critical Vendor Fund was paid to GOL on the premise that it would be exclusively applied to the payment of prepetition Oil and Gas Obligations, which were held by the Operators. GOL did not disburse all of the Critical Vendor Fund it received to Operators holding prepetition Oil and Gas Obligations as required by the Court's Critical Vendor Order, to the detriment of Plaintiffs, as well as the bankruptcy estates

**COUNT I - DECLARATORY JUDGMENT ALLOCATING CRITICAL VENDOR FUND AMONGST OPERATORS HOLDING ALLOWED PREPETITION OIL AND GAS OBLIGATIONS**

91.     Plaintiffs restate and re-allege all prior paragraphs as though fully set forth herein. This claim for relief arises under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and Bankruptcy Rules 7001(2) and 7001(9).

92.     Plaintiffs seek declaratory judgment allocating the $13,000,000 Critical Vendor Fund paid to GOL amongst the Operators holding and prepetition Oil and Gas Obligations against the Debtors and determining Plaintiffs' apportionment of these funds.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiffs pray for the following relief and judgment:

Enter a declaratory judgment as requested under Count I above and for such other relief to which the Plaintiffs may be justly entitled.

Respectfully submitted on October 14, 2025.

/s/ Benjamin W. Kadden
BENJAMIN M. KADDEN (Tex. Bar No. 24077542)
KATHERINE E. CLARK (LA Bar No. 40180)*
COLEMAN L. TORRANS (LA Bar No. 38917)*
**LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD**
601 Poydras Street, Suite 2775
New Orleans, Louisiana 70130
Tel: (504) 310-9148
Fax: (504) 310-9195
Email: bkadden@lawla.com
kclark@lawla.com
ctorrans@lawla.com

*Counsel for R & R Liftboats, Inc.*
(*pro hac vice* request forthcoming)

**PHELPS DUNBAR LLP**

/s/ Jeremy T. Grabill
Jeremy T. Grabill (Federal ID No. 2052797)
Gary A. Hemphill (admitted *pro hac vice*)
Arthur R. Kraatz (Federal ID No. 2895505)
Canal Place | 365 Canal Street, Suite 2000
New Orleans, Louisiana 70130
Telephone: 504 566 1311
Facsimile: 504 568 9130
Email: jeremy.grabill@phelps.com
gary.hemphill@phelps.com
arthur.kraatz@phelps.com

**ATTORNEYS FOR SEACOR MARINE, LLC**

**STAINES, EPPLING & KENNEY**

/s/Jason R. Kenney
JASON R. KENNEY (#29933)
MICHAEL W. MALDONADO (#39266)
3500 N. Causeway Boulevard, Suite 820
Metairie, Louisiana 70002
Telephone:	(504) 838-0019
Facsimile:	(504) 838-0043
Email:	jason@seklaw.com
michael@seklaw.com

*Counsel for Plaintiff, Offshore Liftboats, LLC*

21