# EXHIBIT 1

BROKERAGE AGREEMENT

This Brokerage Agreement is entered into between GOL, LLC (hereinafter "Broker") and R & R Boats, Inc. (hereinafter "Operator").

WHEREAS, Broker and Operator separately are in the business of providing crewed vessels for marine transportation in support of oil and gas exploration and production;

WHEREAS, from time to time in situations of excess demand for vessels or otherwise, Broker is also in the business of acting as a boat broker between various charterers of vessels and the operators of such vessels;

WHEREAS, to obtain additional work for Operator's vessels, Operator wishes to establish a relationship by which Broker can serve as a boat broker for Operator's vessels; and

NOW, THEREFORE, Broker and Operator, each in consideration of the promises and agreements of the other, mutually agree as follows:

1.    Appointment of Broker

Operator hereby appoints Broker as Operator's agent for obtaining charters for Operator's vessels. Nothing in this agreement shall be construed as being an exclusive appointment, and Broker will act for Operator on a job-by-job basis and not as the exclusive broker for Operator.

2.    Duties

A.    At such time as Broker obtains a proposed charter for a vessel, Broker shall provide to Operator all necessary information it receives from the prospective Charterer, and Operator shall have the right to accept or reject the charter so offered.

If Operator orally agrees to accept a job offered by Broker, Broker is hereby authorized by Operator to sign, as agent on behalf of Operator, a Charter, Work Order or similar agreement, should same be required by the Charterer.

A "Work Order Confirmation" in the form attached hereto shall be executed by the parties setting forth the details of each particular job. However, if the parties do not to execute a "Work Order Confirmation," this Brokerage Agreement shall nevertheless apply to and govern all jobs involving Broker and Operator.

It is also understood that the Charterer may require that a Master Time Charter or similar charter (hereinafter "Time Charter") be in place between Broker and Charterer, and that the charter of Operator's vessel will be controlled by said Time Charter. Operator agrees that all

obligations under the Time Charter, including defense and indemnity provisions and insurance requirements, shall become the obligations solely of Operator, not Broker. If the Charterer makes demand to enforce such obligations on Broker or Broker's insurers, Operator agrees to respond to Charterer's demand, to perform said obligations, and to defend and indemnify Broker and its insurers from such demands.

3.    Brokerage Fee

Operator agrees to pay Broker a fee of __ percent (__%) of the daily charter hire per day per vessel for each day a vessel is working under a charter provided by Broker, it being understood that Broker is acting as the broker for the vessels and is not the Charterer.

4.    Charter Hire

The agreed daily rate for charter hire will be paid as follows:

A.    Operator consents to the Charterer paying the charter hire to Broker in such instances where the Charterer will do so. Invoicing by Broker to the Charterer will be on a per-job basis and according to the requirements of the Charterer.

B.    Broker will use reasonable efforts to obtain from the Charterer provisions for payment within a reasonable time.

C.    Broker will remit net charter hire (charter hire less Broker's fee) to Operator within fifteen (15) business days after receipt of such charter hire from the Charterer. It shall be sufficient that such remittance be placed in the mail within the time allowed above. In the event charter hire is paid directly to Operator from the Charterer, Operator shall remit broker's fee to Broker within the same fifteen (15) day period.

D.    Under no circumstances shall Broker be responsible to Operator for the Charterer's non-payment of charter hire. Broker agrees to undertake all reasonable efforts to collect charter hire from the Charterer. Operator retains the right to act on its own behalf in order to collect unpaid invoices directly from the Charterer.

5.    Indemnities and Insurance

Operator agrees to release, defend and indemnify Broker, its parent, subsidiary and affiliated companies, and all of their servants, directors, officers, members, employees and insurers (hereinafter collectively referred to as "Broker, et al.") from and against all claims, demands, and causes of action of every kind and character brought against Broker, et al., for injury to, illness of, or death of any persons, for pollution, clean-up or pollution-related damages and expenses, and for damage to or loss of any property, (including but not limited to costs of litigation and attorneys fees), arising directly or indirectly out of, incident to, and/or in any way connected with the work and/or services to be performed under this Brokerage Agreement,

and/or pursuant to any Charter, Work Order or other agreement negotiated and/or bound pursuant to this Brokerage Agreement (including vessel loading, unloading, ingress and egress), without limit and without regard to the cause or causes thereof, including the sole or concurrent negligence of Broker, et al., and/or the unseaworthiness (pre-existing or otherwise) of any vessel.

If both Operator and Broker owe release, defense and/or indemnity to Charterer for the same risks (through this or any other agreement), Operator will fulfill Operator's said obligations to Charterer without Operator or Operator's insurers seeking sharing, recoupment or other recovery from Broker or Broker's insurers.

Operator agrees to maintain adequate liability and contractual liability insurance covering the above set forth risks and the above set forth defense and indemnity obligations, and further agrees that Broker, et al, and Charterer ( if and as required by the Time Charter), will be named as additional insureds with waivers of subrogation on all of Operator's insurance policies, with said additional insureds' coverage primary as respects any other coverages available to Broker, et al, and Charterer (if and as required by the Time Charter), and Charterer, and with all deductibles and premiums solely the responsibility of Operator.  Operator shall provide to Broker current Certificates of Insurance reflecting the insurance coverage and provisions required by this Brokerage Agreement; however, neither Operator's failure to provide current Certificates of Insurance nor Broker's failure to object to any provisions thereof shall relieve Operator of any obligations or waive any of Broker's rights.

6.    Applicable Law

This Brokerage Agreement shall be governed, interpreted and controlled by the General Maritime Laws of the United States of America.

This Brokerage Agreement supersedes all existing and prior agreements between the parties with respect to the marine transportation and vessel broker activities involved herein, and is executed by authorized representatives of the parties in duplicate on the dates indicated below.

BROKER: GOL, LLC

By: _____

Title: _Manager_____

Date: _4/19/2016_____

OPERATOR: R & R Boats, Inc

By: _____

Title: _Owner / Sec._____

Date: _5/10/16_____

99739949/23458-1

-3-

# EXHIBIT 2

BROKERAGE AGREEMENT

This Brokerage Agreement is entered into between GOL, LLC (hereinafter "Broker") and Offshore Liftboats, LLC (hereinafter "Operator").

WHEREAS, Broker and Operator separately are in the business of providing crewed vessels for marine transportation in support of oil and gas exploration and production;

WHEREAS, from time to time in situations of excess demand for vessels or otherwise, Broker is also in the business of acting as a boat broker between various charterers of vessels and the operators of such vessels;

WHEREAS, to obtain additional work for Operator's vessels, Operator wishes to establish a relationship by which Broker can serve as a boat broker for Operator's vessels; and

NOW, THEREFORE, Broker and Operator, each in consideration of the promises and agreements of the other, mutually agree as follows:

1.      Appointment of Broker

Operator hereby appoints Broker as Operator's agent for obtaining charters for Operator's vessels.  Nothing in this agreement shall be construed as being an exclusive appointment, and Broker will act for Operator on a job-by-job basis and not as the exclusive broker for Operator.

2.      Duties

A.      At such time as Broker obtains a proposed charter for a vessel, Broker shall provide to Operator all necessary information it receives from the prospective Charterer, and Operator shall have the right to accept or reject the charter so offered.

If Operator orally agrees to accept a job offered by Broker, Broker is hereby authorized by Operator to sign, as agent on behalf of Operator, a Charter, Work Order or similar agreement, should same be required by the Charterer.

A "Work Order Confirmation" in the form attached hereto shall be executed by the parties setting forth the details of each particular job. However, if the parties do not to execute a "Work Order Confirmation," this Brokerage Agreement shall nevertheless apply to and govern all jobs involving Broker and Operator.

It is also understood that the Charterer may require that a Master Time Charter or similar charter (hereinafter "Time Charter") be in place between Broker and Charterer, and that the charter of Operator's vessel will be controlled by said Time Charter.  Operator agrees that all

<div style="border:1px solid black; text-align:center">

**EXHIBIT**

**A**

</div>

obligations under the Time Charter, including defense and indemnity provisions and insurance requirements, shall become the obligations solely of Operator, not Broker. If the Charterer makes demand to enforce such obligations on Broker or Broker's insurers, Operator agrees to respond to Charterer's demand, to perform said obligations, and to defend and indemnify Broker and its insurers from such demands.

3.    Brokerage Fee

Operator agrees to pay Broker a fee of ___ percent (___%) of the daily charter hire per day per vessel for each day a vessel is working under a charter provided by Broker, it being understood that Broker is acting as the broker for the vessels and is not the Charterer.

4.    Charter Hire

The agreed daily rate for charter hire will be paid as follows:

A.    Operator consents to the Charterer paying the charter hire to Broker in such instances where the Charterer will do so. Invoicing by Broker to the Charterer will be on a per-job basis and according to the requirements of the Charterer.

B.    Broker will use reasonable efforts to obtain from the Charterer provisions for payment within a reasonable time.

C.    Broker will remit net charter hire (charter hire less Broker's fee) to Operator within fifteen (15) business days after receipt of such charter hire from the Charterer. It shall be sufficient that such remittance be placed in the mail within the time allowed above. In the event charter hire is paid directly to Operator from the Charterer, Operator shall remit broker's fee to Broker within the same fifteen (15) day period.

D.    Under no circumstances shall Broker be responsible to Operator for the Charterer's non-payment of charter hire. Broker agrees to undertake all reasonable efforts to collect charter hire from the Charterer. Operator retains the right to act on its own behalf in order to collect unpaid invoices directly from the Charterer.

5.    Indemnities and Insurance

Operator agrees to release, defend and indemnify Broker, its parent, subsidiary and affiliated companies, and all of their servants, directors, officers, members, employees and insurers (hereinafter collectively referred to as "Broker, et al.") from and against all claims, demands, and causes of action of every kind and character brought against Broker, et al., for injury to, illness of, or death of any persons, for pollution, clean-up or pollution-related damages and expenses, and for damage to or loss of any property, (including but not limited to costs of litigation and attorneys fees), arising directly or indirectly out of, incident to, and/or in any way connected with the work and/or services to be performed under this Brokerage Agreement,

and/or pursuant to any Charter, Work Order or other agreement negotiated and/or bound pursuant to this Brokerage Agreement (including vessel loading, unloading, ingress and egress), without limit and without regard to the cause or causes thereof, including the sole or concurrent negligence of Broker, et al., and/or the unseaworthiness (pre-existing or otherwise) of any vessel.

If both Operator and Broker owe release, defense and/or indemnity to Charterer for the same risks (through this or any other agreement), Operator will fulfill Operator's said obligations to Charterer without Operator or Operator's insurers seeking sharing, recoupment or other recovery from Broker or Broker's insurers.

Operator agrees to maintain adequate liability and contractual liability insurance covering the above set forth risks and the above set forth defense and indemnity obligations, and further agrees that Broker, et al, and Charterer ( if and as required by the Time Charter), will be named as additional insureds with waivers of subrogation on all of Operator's insurance policies, with said additional insureds' coverage primary as respects any other coverages available to Broker, et al, and Charterer (if and as required by the Time Charter), and Charterer, and with all deductibles and premiums solely the responsibility of Operator. Operator shall provide to Broker current Certificates of Insurance reflecting the insurance coverage and provisions required by this Brokerage Agreement; however, neither Operator's failure to provide current Certificates of Insurance nor Broker's failure to object to any provisions thereof shall relieve Operator of any obligations or waive any of Broker's rights.

6.    Applicable Law

This Brokerage Agreement shall be governed, interpreted and controlled by the General Maritime Laws of the United States of America.

This Brokerage Agreement supersedes all existing and prior agreements between the parties with respect to the marine transportation and vessel broker activities involved herein, and is executed by authorized representatives of the parties in duplicate on the dates indicated below.

BROKER: GOL, LLC

By: _William Cau_ _____

Title: _Manager_ _____

Date: _4/19/2016_ _____

OPERATOR: Offshore Liftboats, LLC

By: _____

Title: _QHSE Manager_ _____

Date: _4-25-16_

99739949/23458-1

# EXHIBIT 3

BROKERAGE AGREEMENT

This Brokerage Agreement is entered into between GOL, LLC (hereinafter "Broker") and SEACOR Marine LLC, or its affiliates including, but not limited to, Falcon Global LLC (hereinafter "Operator").

WHEREAS, Broker and Operator separately are in the business of providing crewed vessels for marine transportation in support of oil and gas exploration and production;

WHEREAS, from time to time in situations of excess demand for vessels or otherwise, Broker is also in the business of acting as a vessel broker between various charterers of vessels and the operators of such vessels;

WHEREAS, to obtain additional work for Operator's vessels, Operator wishes to establish a relationship by which Broker can serve as a boat broker for Operator's vessels; and

NOW, THEREFORE, Broker and Operator, each in consideration of the promises and agreements of the other, mutually agree as follows:

1. __Appointment of Broker__

Operator hereby appoints Broker as Operator's agent solely for the purpose of obtaining charters for Operator's vessels. Nothing in this agreement shall be construed as being an exclusive appointment, and Broker will act for Operator on a job-by-job basis and not as the exclusive broker for Operator.

2. __Duties__

A. At such time as Broker obtains a proposed charter for a vessel, Broker shall provide to Operator all necessary information it receives from the prospective Charterer, and Operator shall have the right to accept or reject the charter so offered. Broker shall obtain from the prospective customer a Charter, Work Order or other similar agreement and will provide a copy such to Operator as soon as reasonably possible.

- If Operator orally agrees to accept a job offered by Broker, Broker is hereby authorized by Operator to sign, as agent on behalf of Operator, a Charter, Work Order or similar agreement, should same be required by the Charterer. In no event is Broker authorized to sign on behalf of Operator, a Charter, Work Order or similar agreement without prior written communication with Operator by electronic means or otherwise.

EXHIBIT

A

A "Work Order Confirmation" in the form attached hereto shall be executed by the parties setting forth the details of each particular job. However, if the parties do not to execute a "Work Order Confirmation," this Brokerage Agreement shall nevertheless apply to and govern all jobs involving Broker and Operator.

It is also understood that the Charterer may require that a Master Time Charter or similar charter (hereinafter "Time Charter") be in place between Broker and Charterer, and that the charter of Operator's vessel will be controlled by said Time Charter. Operator agrees that all obligations under the Time Charter, including defense and indemnity provisions and insurance requirements, shall become the obligations solely of Operator, not Broker. If the Charterer makes demand to enforce such obligations on Broker or Broker's insurers, Operator agrees to respond to Charterer's demand, to perform said obligations, and to defend and indemnify Broker and its insurers from such demands.

3.   Brokerage Fee

Operator agrees to pay Broker a fee of TBD percent (TBD%) of the daily charter hire per day per vessel for each day a vessel is working under a charter provided by Broker, it being understood that Broker is acting as the broker for the vessels and is not the Charterer.

4.   Charter Hire

The agreed daily rate for charter hire will be paid as follows:

A.   For charters in which Charterer pays charter hire to Broker, Operator consents to the Charterer paying the charter hire to Broker o. Invoicing by Broker to the Charterer will be on a per-job basis and according to the requirements of the Charterer.

B.   Broker will use reasonable efforts to obtain from the Charterer provisions for payment within a reasonable time.

C.   Broker will remit net charter hire (charter hire less Broker's fee) to Operator within fifteen (15) business days after receipt of such charter hire from the Charterer. It shall be sufficient that such remittance be placed in the mail within the time allowed above. In the event charter hire is paid directly to Operator from the Charterer, Operator shall remit broker's fee to Broker within the same fifteen (15) day period.

D.   Under no circumstances shall Broker be responsible to Operator for the Charterer's non-payment of charter hire. Broker agrees to undertake all reasonable efforts to collect charter hire from the Charterer. Operator

- 2 -

GOL - 000032

retains the right to act on its own behalf in order to collect unpaid invoices directly from the Charterer.

5. Indemnities and Insurance

Operator agrees to release, defend and indemnify Broker, its parent, subsidiary and affiliated companies, and all of their servants, directors, officers, members, employees and insurers (hereinafter collectively referred to as "Broker, et al.") from and against all claims, demands, and causes of action of every kind and character brought against Broker, et al., for injury to, illness of, or death of any persons, for pollution, clean-up or pollution-related damages and expenses, and for damage to or loss of any property, (including but not limited to costs of litigation and attorneys fees), arising directly or indirectly out of, incident to, and/or in any way connected with the work and/or services to be performed under this Brokerage Agreement, and/or pursuant to any Charter, Work Order or other agreement negotiated and/or bound pursuant to this Brokerage Agreement (including vessel loading, unloading, ingress and egress), without limit and without regard to the cause or causes thereof, including the sole or concurrent negligence of Broker, et al., and/or the unseaworthiness (pre-existing or otherwise) of any vessel.

If both Operator and Broker owe release, defense and/or indemnity to Charterer for the same risks (through this or any other agreement) arising directly or indirectly out of, incident to, and/or in any way connected with the work and/or services performed by Operator under this Brokerage Agreement, Operator will fulfill Operator's said obligations to Charterer without Operator or Operator's insurers seeking sharing, recoupment or other recovery from Broker or Broker's insurers.

Operator agrees to maintain adequate liability and contractual liability insurance covering the above set forth risks and the above set forth defense and indemnity obligations, and further agrees that Broker, et al, and Charterer ( if and as required by the Time Charter), will be named as additional insureds with waivers of subrogation on all of Operator's insurance policies, with said additional insureds' coverage primary as respects any other coverages available to Broker, et al, and Charterer (if and as required by the Time Charter), and Charterer, and with all deductibles and premiums solely the responsibility of Operator. The requirements to name additional assureds, waive subrogation, and for Operator's insurance to be primary is limited to the risks and obligations assumed in this Brokerage Agreement and/or the applicable Time Charter. Operator shall provide to Broker current Certificates of Insurance reflecting the insurance coverage and provisions required by this Brokerage Agreement; however, neither Operator's failure to provide current Certificates of Insurance nor Broker's failure to object to any provisions thereof shall relieve Operator of any obligations or waive any of Broker's rights.

7. Confidentiality

Broker shall treat and hold as confidential any and all information disclosed or provided by Operator to Broker during the term of this Agreement in written, electronic, oral, visual or other tangible form, that in any way relates or pertains to the nature of its business, including but not limited to its vessels, properties, personnel, operations, customer lists or other proprietary information (collectively, the "Confidential Information"). Broker hereby agrees that it will treat as strictly confidential and will not, directly or indirectly, use any Confidential Information other

GOL - 000033

than for the purpose of locating prospective work and/or services to be provided by the certain vessels pursuant to this Agreement.

6.    Applicable Law

This Brokerage Agreement shall be governed, interpreted and controlled by the General Maritime Laws of the United States of America.

This Brokerage Agreement supersedes all existing and prior agreements between the parties with respect to the marine transportation and vessel broker activities involved herein, and is executed by authorized representatives of the parties in duplicate on the dates indicated below.

BROKER: GOL, LLC

By: _____

Title: _____

Date: _____

OPERATOR: SEACOR Marine LLC

By: _____ Robert Clemons

Title: EVP & COO

Date: 17- May - 18

99739949/23458-1

- 4 -

GOL - 000034

# EXHIBIT 4

May 25, 2023

TO:    **GOL, LLC**
       Ronald "Rec" Chaddock, President
       4535 Highway 308
       P.O. Box 309
       Raceland, LA 70394

## Trade Agreement

As you may be aware, on May 14, 2023 (the "**Petition Date**"), MLCJR LLC, together with certain of its affiliates, including but not limited to Cox Operating, L.L.C. (collectively, the "**Debtors**"), filed voluntary petitions to commence cases (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**"). On the Petition Date, we requested the Bankruptcy Court's authority to pay certain essential vendors and service providers in recognition of the importance of our relationship with such vendors and service providers. On May 16, 2023, the Bankruptcy Court entered an order (Rec. Doc. 112) (the "**Order**") authorizing the Debtors, under certain conditions, to pay in the ordinary course prepetition claims of certain vendors and service providers that agree to be bound by the terms of the Order and to the terms set forth below. A copy of the Order is enclosed.

To receive payment on pre-bankruptcy claims, the Debtors require GOL, LLC (hereinafter "**GOL**") to agree to supply goods and/or services to the Debtors based on "Customary Trade Terms." Customary Trade Terms are trade terms that are the same or better than the trade terms that existed immediately prior to the Petition Date or, if more favorable, that existed within the sixty-day (60) period prior to the Petition Date. Debtors understand and agree that GOL has regularly provided, and may continue to provide, the services of vessels owned and operated by third-party vessel owners and operators. Those third-party vessel owners and operators who agree to continue providing vessels and/or services based on Customary Trade Terms shall be "**Third-Party Vessel Interests.**" The inability of Third-Party Vessel Interests to provide services to GOL or the Debtors shall not be a default by GOL under this Trade Agreement provided, however, that GOL agrees to supply the same or commercially equivalent fleet of vessels to the Debtors that existed in the sixty-day (60) period prior to the Petition Date.

For purposes of administration of this trade program as authorized by the Bankruptcy Court (the "**Trade Payment Program**"), the Debtors and you agree as follows:

1) For purposes of this trade agreement (the "**Trade Agreement**"), the Debtors estimate that the balance of GOL's prepetition claim (subject to final reconciliation, setoffs, credits and/or discounts) (the "**Prepetition Claim**") is approximately $24.8 million.

2) Upon receipt of the fully executed Trade Agreement between you and the Debtors, the Debtors agree to pay $13,000,000 towards GOL's Prepetition Claim (the "**Payment**

US-DOCS\142189047.3

**EXHIBIT 2**

**Amount**") in four (4) consecutive weekly payments, commencing the week ending May 26, 2023, as follows:

a) Payment 1: $3,900,000, on or before May 26, 2023;

b) Payment 2: $3,900,000, on or before June 2, 2023;

c) Payment 3: $2,600,000, on or before June 9, 2023; and

d) Payment 4: $2,600,000, on or before June 16, 2023.

3) GOL will, for at least the pendency of the Bankruptcy Cases, extend to the Debtors all Customary Trade Terms, which are:

a) GOL's receipt of payment within sixty (60) days from the Debtors' receipt of undisputed invoices or the payment of all undisputed potions of said invoices;

4) To the extent applicable, and upon the filing of your Proof of Claim in the Bankruptcy Cases, the Payment Amount shall be applied to the Prepetition Claim in the following order of priority:

a) *first*, to any amount entitled to priority under section 503(b)(9) of the Bankruptcy Code;

b) *second*, to any amount secured by a lien or which is otherwise entitled to secured status; and

c) *third*, to general unsecured amounts.

5) Payment of GOL's Prepetition Claim in the manner set forth in the Order and herein may occur upon execution of this letter by a duly authorized representative of GOL and the return of this letter to the Debtors. Your execution of this letter agreement and the return of the same to the Debtors constitutes an agreement by you and the Debtors in which you agree:

a) to the Customary Trade Terms and, subject to the reservations contained in the Order and herein, to the amount of the Prepetition Claim;

b) to supply the Debtors with goods and/or services under the Customary Trade Terms provided (i) the Debtors are not in default with respect to any of their obligations to GOL that accrued after the Petition Date (subject to any applicable cure periods), including the timely payment of all invoices in accordance with, or faster than, set terms, (ii) the Debtors are not in default of their obligations set forth in this Trade Agreement including, but not limited to, the obligation to make the Payment Amount set forth in paragraph 2 herein, (iii) an order to convert any of the Bankruptcy Cases to Chapter 7 has not been entered by a court of competent jurisdiction against the Debtors (each, an "**Event of Default**");

c) that, until the earlier of (i) an uncured Event of Default or (ii) the effective day of a plan of reorganization, the trade terms, credit line (if applicable), pricing (subject to

2

normal and customary market fluctuations), and/or trade offerings (goods and services) extended are normal and customary within the industry and/or are the same or more favorable than existed within the sixty-day (60) period prior to the Petition Date;

d) that, until the earlier of (i) an uncured Event of Default or (ii) the effective day of a plan of reorganization for the Debtors, you will continue to supply the Debtors with goods and/or services under the Customary Trade Terms and any terms set forth herein, and that the Debtors will pay for such goods and/or services in accordance with the terms hereof;

e) that you have reviewed, and have had the opportunity to review with counsel, the terms and provisions of the Order and this Trade Agreement, and acknowledge that you are bound by such terms;

f) that, except as required by applicable law, rule, or regulation, you will keep and treat the information contained in this Trade Agreement as confidential;

g) that if you cease to provide Customary Trade Terms and the Debtors are not in breach of their obligations to you under this Trade Agreement or on account of the provision of post-petition goods and/or services, any portion(s) of the Payment Amount received by you on account of your Prepetition Claim will be deemed to have been in payment of post-petition obligations owed to you, and the Debtors may take any and all appropriate steps to cause you to repay payments made to you on account of your Prepetition Claim to the extent that such payments exceed the post-petition amounts then owing to you, without giving effect to any rights of setoff, claims, provision for payment of reclamation or trust fund claims, or other defense; and

h) that the Debtors reserve all of their rights with respect to such claims and do not hereby concede the validity of any lien or other priority status asserted in respect thereof.

6) Debtor Breach: Upon an Event of Default, and the Debtors' failure to cure such default within ten (10) business days after receiving written notice of such default from GOL,[1] GOL (i) shall have no obligation to supply goods and/or services to the Debtors pursuant to the Customary Trade Terms until the Debtors cure such default, (ii) shall have the right to terminate this Trade Agreement upon written notice to the Debtors detailing the Debtors' defaults hereunder (which Debtors shall have the right to dispute) (the date of such termination, the "**Termination Date**"), and (iii) may exercise any rights and remedies available under applicable law.

7) Miscellaneous

---

[1] Such written notice shall be sent via email to the undersigned and counsel to the Debtors (Latham & Watkins, Attention: Keith Simon at keith.simon@lw.com).

3

a)   This Trade Agreement will be effective immediately upon execution by the Parties and shall terminate upon the earlier of (i) the Termination Date or (ii) the effective day of a plan of reorganization for the Debtors.

b)   The Parties warrant that they have full authority to execute this Trade Agreement on behalf of the respective Parties. This Trade Agreement sets forth the entire understanding of the Parties regarding the subject matter herein and supersedes all prior oral and written agreements between them related to payment from the Debtors due and owing to GOL. This Trade Agreement may not be changed, modified, amended or supplemented, except in a writing signed by both Parties.

c)   This Trade Agreement may be executed in counterparts, each of which shall be deemed to be original, but all of which shall constitute one and the same agreement.

d)   The Debtors and GOL also hereby agree that any dispute with respect to this Trade Agreement, the Order and/or GOL's participation in the Trade Payment Program shall be determined exclusively by the Bankruptcy Court.

Sincerely,

**COX OPERATING, LLC**

By: Ryan Omohundro
Its: Chief Restructuring Officer
Dated: May 26, 2023
romohundro@alvarezandmarsal.com

Agreed and accepted by:

**GOL, LLC**

By: Joel N. Broussard
Its: member manager
Dated: 5/25/2023

4

US-DOCS\142189047.3